UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>Carolyn Hunt</u>


     v.                                 Civil No. 13-cv-074-JD
                                          Opinion No. 2013 DNH 122

<u>Carolyn W. Colvin,</u>[1]
<u>Acting Commissioner,</u>
<u>Social Security Administration</u>


O R D E R


     Carolyn Hunt seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner of the Social Security Administration, denying her application for disability insurance benefits.  Hunt contends that the Administrative Law Judge ("ALJ") erred in failing to consider a statement provided by a former employer, in relying on the Medical-Vocational Guidelines ("Grid"), in assessing the severity of her mental limitations, and in concluding that her activities supported an ability to do light work.  The Acting Commissioner moves to affirm the decision on the grounds that substantial evidence supports the ALJ's decision.

---

    [1]Carolyn W. Colvin became the Acting Commissioner on February 14, 2013, and is substituted automatically as the defendant pursuant to Federal Rule of Civil Procedure 25(d).

Background

Hunt filed an application for disability insurance benefits on April 21, 2010, when she was forty-six years old, alleging a disability as of August 10, 2003.  She later amended the onset date to October 1, 2008.  Hunt's alleged disabilities arose after she was injured when a pickup truck hit her in 1997.

A.  Medical Background

In February of 2008, Hunt was seen at Ammonoosuc Community Health Services in Littleton, New Hampshire, by Dr. Mourad for complaints of insomnia and depression.  Her neurological examination was essentially normal.  A year later, Hunt again complained of insomnia and also reported difficulty with motor functions when she was tired.  Her examination was again essentially normal.

Hunt also received chiropractic treatment.  Her chiropractor wrote in a letter dated August 6, 2009, that he had treated Hunt for four years for episodic pain.  He had provided chiropractic spinal adjustments and myofascial trigger point therapy, but Hunt had not had long term improvement.

Dr. Mourad saw Hunt in August of 2009 and noted chronic back pain.  X-rays taken on August 18, 2009, showed early degenerative

disc disease with mild disc space narrowing in the cervical
spine.  The lumbar spine was normal.

Hunt had a sleep consultation with Dr. Bianca Lang in
October of 2009.  Dr. Lang scheduled a diagnostic polysomnogram
for Hunt that was done by Dr. Keith Warren on October 30, 2009.
The testing showed that Hunt slept for about six hours and had a
mild degree of obstructive sleep apnea.  Dr. Warren planned to
study Hunt further to rule out hypersomnia and also prescribed a
CPAP machine to treat her mild obstructive sleep apnea.  At the
hearing in August of 2011, Hunt testified that she did not use
the CPAP machine because the masks caused problems and made the
condition worse.

She saw Dr. Nelson at Ammonoosuc Community Health Service in
March of 2010 for complaints of insomnia, various physical
symptoms and pain, and difficulty with memory, speaking, and
cognition.  Dr. Nelson assessed insomnia, back pain, foot pain,
and traumatic brain injury.  At an appointment in October of
2010, Hunt again complained of difficulty sleeping and fatigue.

On July 9, 2010, state agency reviewing physician, Dr. Hugh
Fairley, assessed Hunt's residual functional capacity from her
medical records.  Dr. Fairley concluded that Hunt was able to
lift ten pounds frequently and lift twenty pounds occasionally
and was able to sit, stand, or walk for about six hours each in

3

an eight-hour work day.   Dr. Fairley found that Hunt could only occasionally do postural activities and could never climb ropes, ladders, or scaffolds.

Hunt had a consultative psychological examination on July 14, 2010, which was done by Jeffrey Kay, PsyD, ThD.   Hunt reported pain in her neck, shoulders, back, legs, head, and feet. Dr. Kay noticed that Hunt had difficulty getting out of her chair.   Hunt also reported difficulty sleeping, chronic fatigue, difficulty with memory and concentration, and anxiety.

Dr. Kay administered several tests that showed Hunt had excellent attention and short-term memory.   He noted that Hunt's reports of impairment were in striking contrast to her test results.   Based on Hunt's reports, Dr. Kay concluded that Hunt had memory and attention problems, along with depression and anxiety, because of her sleeping disorder.   He believed that Hunt's psychological problems would improve with treatment of the sleep disorder.

On August 19, 2010, state agency reviewing psychologist William Jamieson, PhD, concluded, based on her medical records, that Hunt's mental impairments were not severe.   Dr. Jamieson gave Dr. Kay's diagnoses little weight because they were based on an underlying sleep disorder rather than a psychological impairment.

4

Hunt had counseling sessions with a social worker, Stephen Noyes, in November.  The mental status examination showed a cooperative manner, upright posture, coherent and appropriate thought process, logical and appropriate thought content, fluent speech, and appropriate mood and affect.  Noyes assessed Hunt with a Global Assessment of Functioning ("GAF") score of 60, which indicates moderate symptoms.

Dr. Nelson referred Hunt for an evaluation of her reported memory loss.  Dr. Gopalan Umashankar examined Hunt and conducted a mental status examination in December of 2010 and January of 2011.  The mental status examination showed normal results, and the neurological examination was also normal.  Dr. Umashankar assessed a mild cognitive impairment and memory loss.

 Dr. Umashankar ordered an MRI, EEG, and MRA tests which provided normal results except for a small chronic hemorrhage that caused left hyperflexia, which was likely caused by prior trauma.  Dr. Umashankar planned to refer Hunt to Dartmouth Hitchcock Medical Center for a neuropsychological evaluation.

On April 19, 2011, Robert Roth, PhD, conducted a neuropsychological evaluation of Hunt.  Hunt complained of a cognitive decline since her injury in 1997.  She stated that she experienced headaches, confusion, and cognitive problems during several days in 2003 and reported that a physician told her at

that time that she had suffered a transient ischemic attack ("TIA") and an aneurism.  Dr. Roth noted, however, that Hunt's medical records showed no mention of a TIA or aneurism and that her EEG and ENG tests in 2005 showed unremarkable results.

Dr. Roth conducted several tests to assess Hunt's cognitive functioning.  Hunt had a depressed and anxious mood during testing.  Dr. Roth found that Hunt demonstrated superior overall intellectual abilities and generally intact performance in attention and concentration, executive functions, memory, language, and visuospatial abilities.  Overall, Dr. Roth concluded that Hunt had intact cognitive functioning and that her subjective complaints of cognitive difficulties were due to "affective distress" and poor sleep.

In April of 2011, physical therapists evaluated Hunt for residual functional capacity.  Hunt told them that she lost her job because of back pain and a brain injury and that she had cognitive problems because of a stroke in 2003.  The physical therapists noted that the amount of pain Hunt reported was inconsistent with her observed behavior.  The physical therapists concluded that Hunt could do work requiring lifting at the light level, meaning that she would lift ten pounds and lift twenty pounds less frequently, and could do work requiring carrying at the light to medium level, carrying twenty pounds and less

frequently carrying thirty-five pounds.  She could sit for forty-
five minutes at a time, stand for twenty-two minutes, and walk
for twenty minutes.

In May of 2011, Dr. Nelson completed a residual functional
capacity assessment.  Dr. Nelson concluded that Hunt could lift
ten pounds frequently and lift twenty pounds occasionally.
Although Hunt was limited in sitting, standing, and walking for
the periods found by the physical therapists, Dr. Nelson
concluded that Hunt could sit, stand, and walk for a total of
four hours each per day.  Dr. Nelson limited Hunt to only
occasional manipulative tasks with her hands, use of her feet,
and postural activities.  In Dr. Nelson's opinion, Hunt had no
limitations in understanding, remembering, and carrying out
simple instructions; mild limitations in making simple work
decisions; a moderate limitation in understanding, remembering,
and carrying out complex instructions; and a marked limitation in
her ability to make complex work decisions.

Hunt met with Noyes in June of 2011.  Noyes found that Hunt
was depressed and anxious, which was appropriate in reaction to
news that her mother was dying of cancer.  Hunt's mental status
examination had normal and appropriate results.  Noyes assessed a
GAF score of 70, which indicates mild symptoms.

Hunt's chiropractor, John Strasser, drafted a letter for Hunt in July of 2011.  In the letter, Strasser stated that Hunt had had pain since her injury in 1997 and that his treatment had been largely palliative.  He believed that Hunt could not do reaching or bending activities and could not sit or stand for extended periods.  Strasser thought that Hunt's pain had a significant impact on her concentration and that when she was tired, she could not keep up with the pace of a competitive work setting.

Noyes also wrote a letter on Hunt's behalf in July of 2011. Noyes stated that he thought Hunt's reported symptoms were consistent with brain injury and that her depression and fibromyalgia "stressed an already compromised nervous system." Noyes thought that Hunt would be unable to tolerate the stress and pace of a normal work environment.

In a letter dated October 19, 2011, Dr. Nelson wrote that he thought Hunt had fibromyalgia and that it was likely she had had fibromyalgia for many years.  Dr. Kay provided a statement dated February 14, 2012, in which he noted that Hunt had been diagnosed with fibromyalgia and that fibromyalgia can cause sleep problems. Dr. Kay also stated that he had diagnosed Hunt with mood and anxiety disorders caused by a sleep disorder.

Peter W. Powell, who had been Hunt's employer, provided a statement dated March 23, 2010, about her ability to function while he employed her.  Powell stated that Hunt worked in his real estate office as a receptionist and secretary from May 30, 2006, until January 15, 2010, when she was asked to leave because of poor performance.  Powell said that Hunt's work was more than satisfactory when she began but deteriorated over time.  He explained that Hunt could not take basic messages correctly, that she was tired at work, that she did not follow through on tasks, and that she forgot what she had been asked to do.  He lacked confidence that she would do what he asked.  Powell also observed that Hunt had had pain and discomfort while working.

B.  Procedural Background

After her application was denied on initial review, Hunt requested a hearing before an ALJ which was held on August 2, 2011.  Hunt was represented by counsel and testified at the hearing.

Hunt testified that she could not work because nerve damage in her neck and sacroiliac joint prevented her from sitting for long periods of time which caused her legs and arms to go numb. She said that she had problems focusing which interfered with her ability to follow sequences and to accomplish complex tasks and

that she had difficulty understanding instructions.  Hunt also
said that she had fatigue, due to non-restorative sleep, which
caused problems with pain and concentration, and that she could
not work because she could not drive on some days.

Hunt described her work at Peter Powell Real Estate and
explained that her employer changed her to part-time work in
October of 2008.  She said that she was not always able to
complete her work day even on the part-time schedule and that she
missed four or five days of work each month.  Hunt testified that
she could not sit longer than an hour to an hour and a half
without needing to get up to loosen her legs, shoulders, and neck
and to regain circulation in her hands.  She explained that she
lost the real estate office job because she was having difficulty
doing her work properly.

While working for Peter Powell Real Estate, Hunt also worked
part time, for four and one-half to five years, as a customer
service representative for a catalog sales company.  After those
jobs ended, Hunt worked part time as a census enumerator from
April through mid-June of 2010.  Hunt continues to work part time
with her husband doing performances as a storyteller.

Hunt said that she could not do many activities that she had
enjoyed previously, although she could still snowshoe, cross
country ski, and hike for short distances on fairly level trails.

She described her daily activities as housework, walking to the post office, reading, quilting, and sewing.  She said that she could not do any activity for more than an hour or so because of fatigue.  On some days, she had difficulty retaining what she was reading.  She usually napped in the afternoon, and walked in the evening with her husband for a mile or mile and a half.  She said that her husband did most of the household chores and did grocery shopping with her.  She said that her pain was increasing and her sleep issues were not improving so that she could do less and less as time went on.

The ALJ issued the decision on August 26, 2011.  He found that Hunt retained the residual functional capacity to do light work, as defined at 20 C.F.R. § 404.1567(b), with only occasional postural activities and limited to simple and repetitive tasks. The ALJ concluded that Hunt was not disabled, using the Grid, Rule 202.21, as a framework for the decision.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Hunt's request for review.


## Discussion

Hunt moves to reverse the decision.  Hunt argues that the ALJ erred in ignoring Powell's statement about her employment at his real estate office, did not properly assess her residual

function capacity as to the severity of Hunt's mental limitations and the import of her daily activities, and improperly relied on the Grid to determine that she was not disabled.  The Commissioner moves to affirm the decision on the grounds that the ALJ was not required to discuss Powell's statement, that substantial evidence supports the ALJ's residual functional capacity assessment, and that the ALJ properly relied on the Grid because Hunt's mental impairments did not significantly affect her ability to perform the full range of jobs at the light exertional level.

In reviewing the final decision of the Commissioner in a social security case, the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001).  The court defers to the ALJ's factual findings as long as they are supported by substantial evidence. § 405(g).  "Substantial evidence is more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Astralis Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010).

A.  <u>Statement from Peter Powell</u>

Under the social security regulations, an ALJ "will consider all evidence in [the applicant's] case when [he] make[s] a determination or decision whether [the applicant is] disabled." 20 C.F.R. § 404.1520(a)(3).  Information from non-medical sources, referred to as other sources, about the claimant's pain or other symptoms, such as what causes or worsens the pain or symptoms, what medications are used, and what affect the pain or symptoms have on daily activities, will be considered as long as that information is consistent with the objective medical evidence.  20 C.F.R. § 404.1529(c)(3).  Such information may include the claimant's prior work record and observations from the work environment.  <u>Id.</u>

Other sources whose opinions will be considered include the claimant's employer.  20 C.F.R. § 404.1513(d)(4).  Evidence from other sources cannot establish a medical impairment but may provide insight into the severity of an impairment that has been diagnosed by an acceptable medical source.  Social Security Ruling 06-03, 2006 WL 2329939, at *2 (August 9, 2006).  In the decision, the ALJ should explain the weight that is given to other source opinions "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning,

13

when such opinions may have an effect on the outcome of the case."  Id. at *6.

Hunt argues that the decision must be reversed because the ALJ did not consider Powell's statement about her limitations while working at the real estate office and the reasons that she lost that job.  The ALJ did not mention Powell's statement in the decision.  However, the ALJ reviewed Hunt's employment history and concluded that she could not work as an administrative assistant, which was her job at the real estate office, because she was limited to simple repetitive tasks.  The ALJ's explanation, therefore, is consistent with Powell's statement.

B.  Residual Functional Capacity[2]

A residual functional capacity assessment determines the most a person can do in a work setting despite her limitations caused by impairments.  20 C.F.R. § 404.1545(a)(1).  The Commissioner's residual functional capacity assessment is reviewed to determine whether it is supported by substantial evidence.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955

---

[2]Hunt frames the issue as the need for testimony from a vocational expert "given Ms. Hunt's extensive exertional and nonexertional limitations."  The ALJ, however, did not find extensive exertional and nonexertional limitations.  Therefore, the issue Hunt addresses is the validity of the ALJ's residual functional capacity that Hunt claims is wrong.

F.2d 765, 769 (1st Cir. 1991); <u>Pacensa v. Astrue</u>, 848 F. Supp. 2d
80, 87 (D. Mass. 2012).

The ALJ found that Hunt could do light work except that she
was limited to simple and repetitive tasks because of her mental
limitations and to doing only occasional postural activities
because of her physical limitations.  Hunt contends that the ALJ
improperly evaluated the evidence of her mental limitations,
which she contends are more significant than the ALJ found.  Hunt
also contends that the ALJ failed to properly consider her
complaints of pain and fatigue, failed to consider her need to
alternate between sitting and standing, and erred in finding that
her activities supported her ability to do light work.

1. <u>Mental Limitations</u>

Hunt contends that she has extensive mental, nonexertional,
limitations, and that the ALJ erred in finding otherwise.  In
support, Hunt argues that some of the medical opinions support a
finding of substantial loss in her ability to function
effectively, meaning a marked limitation.  Hunt also contends
that the ALJ is mistaken in his assessment of her treatment for
mental limitations.

The ALJ attributes weight to a medical opinion based on the
nature of the relationship between the medical source and the

15

claimant, the extent to which the opinion includes supporting information, the consistency of the opinion with the record as a whole, the specialization of the source, and other factors, including the source's understanding of the administrative process and the source's familiarity with the claimant's record. 20 C.F.R. § 404.1527(d); see also SSR 96-2p, 1996 WL 374188 (July 2, 1996). "[A] treating source's opinion on the question of the severity of an impairment will be given controlling weight so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Ormon v. Astrue, 2012 WL 3871560, at *4 (1st Cir. Sept. 7, 2012) (quoting 20 C.F.R. § 404.1527(d)(2)).

Hunt cites the opinions of Dr. Kay, Strasser, and Noyes to support her claim of significant mental limitations. The ALJ addressed those medical opinions and others in the decision. The ALJ explained that he gave limited weight to the opinions provided by Dr. Kay and Noyes because Dr. Kay's opinions were based on Hunt's subjective complaints while he found no objective evidence to support those complaints and Noyes assigned a GAF score of 70, mild symptoms, which undermines any opinion of greater limitations. Strasser, who is a chiropractor, stated that Hunt would be unable to sustain work activity. The ALJ gave

16

Strasser's opinion little weight because the opinion was inconsistent with the medical record.

Hunt contends that the ALJ improperly discounted the opinions of Dr. Kay and Noyes because the record did not include mental health treatment to support the severity they ascribed to her limitations.  She argues that both Dr. Kay and Noyes attributed Hunt's mental limitations to her physical health conditions so that treatment for mental health was not relevant. Although the ALJ mentioned the lack of treatment for mental health, the great weight of his analysis pertained to the inconsistencies between the stated opinions and the findings made by both Dr. Kay and Noyes and the entire medical record. Therefore, even if the ALJ erred in considering the lack of mental health treatment, that issue had little effect on the outcome.

The ALJ relied on the opinion provided by Hunt's treating physician, Dr. David Nelson, as to her mental limitations.  The ALJ gave Dr. Nelson's opinions substantial weight that Hunt had moderate limitations in her ability to understand, remember, and carry out complex instructions but no limitations in her ability to understand, remember, and carry out simple instructions and only mild limitations in her ability to make judgments on simple work decisions.  The ALJ noted that Dr. Nelson's opinions were

consistent with Hunt's medical records, particularly with the GAF
score in the range of 60 to 70, and with Hunt's daily
functioning.

Dr. Nelson's opinion provides substantial evidence to
support the ALJ's residual functional capacity.  Although Hunt
points to conflicting opinions, resolving conflicts in the
evidence is for the ALJ, not the court.  Quintana v. Comm'r of
Social Sec., 110 Fed. Appx. 142, 145 (1st Cir. 2004).  Therefore,
the court defers to the ALJ's evaluation of the evidence.


    2.  Physical Limitations

Hunt contends that her ability to do light work is also
significantly limited because of pain and fatigue and because she
requires an option to alternate between sitting and standing.  In
support of her limitations due to pain and fatigue, Hunt cites
her own descriptions of her symptoms and her hearing testimony.
In support of a limitation requiring an option to sit and stand,
Hunt cites a statement by her chiropractor, a residual functional
capacity assessment by physical therapists, which was adopted by
Dr. Nelson, and her own testimony.

With respect to the limiting effects of pain and fatigue,
the ALJ found that Hunt's statements about the intensity,
persistence, and limiting effects of her symptoms were not

18

entirely credible.   "The credibility determination by the ALJ,
who observed the claimant, evaluated his demeanor, and considered
how that testimony fit in with the rest of the evidence, is
entitled to deference, especially when supported by specific
findings."  <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829
F.2d 192, 195 (1st Cir. 1987).  Evaluation of a claimant's
subjective complaints requires a two-step process.  <u>Cabral v.
Colvin</u>, 2013 WL 4046721, at *7 (D. Mass. Aug. 6, 2013) (citing
<u>Avery v. Sec'y of Health & Human Servs.</u>, 797 F.2d 19, 21 (1st
Cir. 1986)); see also SSR 96-7p, <u>Evaluation of Symptoms in
Disability Claims: Assessing the Credibility of an Individual's
Statements</u>, 1996 WL 374186, at *2 (July 2, 1996).

The ALJ first decides whether there is an underlying
impairment that is shown by medically acceptable diagnostic
techniques and could be expected to cause the claimant's
symptoms.  Second, if such an impairment is found, the ALJ
evaluates the intensity, persistence, and limiting effects of the
impairment or impairments.  At the second step, the claimant's
credibility is assessed based on consideration of several
factors:  the claimant's daily activities, functional
restrictions, non-medical treatment, medications and side-
effects, precipitating and aggravating factors, and the nature,
location, onset, duration, frequency, radiation, and intensity of

the pain.  See 20 C.F.R. § 404.1529(c)(3); Avery, 797 F.2d at 29.
While the ALJ is expected to consider all of the relevant
factors, he need not explicitly analyze each in the decision.
Wenzel v. Astrue, 2012 WL 2679456, at *7 (D.N.H. July 6, 2012).

    The ALJ analyzed Hunt's subjective complaints in accord with
the required standard.  He concluded that "the claimant's
medically determinable impairments could reasonably be expected
to cause the alleged symptoms; however, the claimant's statements
concerning the intensity, persistence and limiting effects of her
symptoms are not entirely credible."  Admin. Rec. at 27.  The ALJ
explained that he found Hunt's testimony to be sincere but her
description of her symptoms was "out of proportion with the
medical evidence of record as a whole."  Id. at 28.

    The ALJ also found that Hunt's daily activities, which
include housework, driving, grocery shopping, and some sewing,
along with her more occasional activities, including easy hiking
and snowshoeing, indicate less severe symptoms than Hunt claimed.
The ALJ also noted that Hunt continued to work, part time, as a
storyteller and that her report to her therapist in November of
2010 was that she was very busy with that work.  Although Hunt
disputes her ability to perform work on a regular basis and
emphasizes her sleep problems, the ALJ evaluated her credibility
appropriately, and that determination is left to the ALJ.

Hunt further contends that the ALJ erred in failing to find
that she is limited to work that would allow a sit and stand
option.  In support, Hunt cites Strasser's statement that he
would advise that sitting or standing for long periods would be
"contraindicated" and the physical therapists' residual
functional capacity assessment that she was limited in the amount
of time she could sit, stand, and walk at one time.[3]

The ALJ explained that he did not rely on Strasser's
opinions and assessments because they were inconsistent with the
medical record as a whole.  The physical therapists evaluated
Hunt on April 26, 2011, and noted that Hunt's reported subjective
pain was inconsistent with her behavior during the evaluation.
The time limits for sitting, standing, and walking were based on
the time Hunt spent in each activity during testing without
complaints of discomfort.[4]

The ALJ gave substantial weight to the residual functional
capacity assessment done by the state medical consultant, Dr.

_____

[3]The evaluation stated that Hunt could sit for forty-five
minutes, stand for twenty-two minutes, and walk for twenty
minutes at a time.

[4]Despite those findings, the physical therapists also noted
that Hunt reported she could drive or ride in a car for an hour
at a time which would more than double the time allowed for
sitting.  Hunt answered in the pain questionnaire for that
assessment that she sits for 13.5 hours each day.  Hunt testified
that she walks for about an hour and a half each day.

Fairley.  Dr. Fairley found that Hunt would be able to stand or
walk for a total of six hours in an eight hour work day and sit
for six hours in an eight hour work day and did not find a
requirement for a sit and stand option.

## C.  Reliance on the Grid

A five-step process is used to evaluate an application for
social security benefits.  20 C.F.R. § 404.1520(a)(4).  At step
five, the Commissioner bears the burden of providing evidence of
specific jobs that the claimant can do.  Seavey, 276 F.3d at 5.
If the plaintiff's limitations are only exertional, meaning
related to strength, the Commissioner can satisfy the burden of
proof by using the Grid, "a chart contained in the Social
Security regulations."  Id.; see also Heggarty v. Sullivan, 947
F.2d 990, 995 (1st Cir. 1991).

"However, if the [plaintiff] has nonexertional limitations
(such as mental, sensory, or skin impairments, or environmental
restrictions such as an inability to tolerate dust) that restrict
his ability to perform jobs he would otherwise be capable of
performing, then the Grid is only a framework to guide the
decision."  Seavey, 276 F.3d at 5 (internal quotation marks and
citations omitted); Heggarty, 947 F.2d at 996 ("If the
occupational base is significantly limited by a nonexertional

22

impairment, the [Commissioner] may not rely on the grid to carry the burden of proving that there are other jobs a claimant can do.").  "As long as the nonexertional impairment 'has the effect only of reducing th[e] occupational base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability.'"  Quintana, 110 Fed. Appx. at 145 (quoting Ortiz v. Sec'y of HHS, 890 F.2d 520, 524 (1st Cir. 1989)).

The ALJ found that Hunt was limited to work with only simple and repetitive tasks.  He also found that she could only occasionally do postural activities.  Hunt does not contend that either of those limitations would reduce the job base for light work to the extent that the Grid would not apply.  Instead, Hunt argues that other limitations should have been part of her residual functional capacity.  Those limitations, she contends, would preclude use of the Grid.

As is explained above, the ALJ did not err in his residual functional capacity assessment.  Therefore, the ALJ could rely on the Grid for the finding of no disability.

## Conclusion

For the foregoing reasons, the claimant's motion to reverse (document no. 7) is denied.  The Commissioner's motion to affirm

(document no. 9) is granted.  The administrative decision is
affirmed.

The clerk of court shall enter judgment accordingly and
close the case.


SO ORDERED.


_____
Joseph A. DiClerico, Jr.
United States District Judge

September 17, 2013

cc:  Ruth Dorothea Heintz, Esquire
     Robert J. Rabuck, Esquire

24